## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

LATERAL RECOVERY LLC, BENCHMARK
BUILDERS, INC., FTE NETWORKS, INC.,
JUS-COM LLC and FOCUS WIRELESS, LLC,

                    Plaintiffs,          Civ. No.:

    v.

CAP CALL LLC, YES FUNDING SERVICES,
LLC, and EVAN MARMOTT,

                    Defendants.

## COMPLAINT

Plaintiffs Lateral Recovery LLC ("Lateral"), as Assignee, Benchmark Builders, Inc. ("Benchmark"), FTE Networks, Inc. ("FTE Networks"), Jus-Com LLC ("Jus-Com") And Focus Wireless, LLC ("Focus" and together with the other FTE Networks, Jus-Com, "FTE") as and for its Complaint against Cap Call, LLC ("Cap Call"), Yes Funding Services, LLC ("Yes Funding"), and Evan Marmott ("Marmott"), and states as a follows:

## NATURE OF THE ACTION

1.    This is a RICO action involving two related merchant cash advance ("MCA") companies that were controlled and manipulated by Defendant Evan Marmott ("Marmott") to carry out a scheme to collect upon unlawful debts and otherwise fraudulently obtain millions of dollars in funds from FTE.  In a span of four months, Marmott's companies, Defendants Cap Call and Yes Funding, entered into five so-called "Merchant Agreements" with FTE pursuant to which they purportedly paid lump sums to purchase "all" of FTE's future receipts at a discount and FTE agree to repay the face value of its receipts through daily payments.  While couched as the purchase of future receipts, the agreements' terms, conditions and the Defendants' actions

demonstrate that despite the form of their agreements, no sale of receipts ever took place and the agreements with FTE were merely a disguise to evade applicable usury laws.  In reality, the FTE agreements were loans that charged interest rates that exceeded not less than 400%, and in some instances exceeded 1500%, rates that are far greater than twice the maximum 25% permitted under New York Penal Law.

2.     Along the way, Defendants also engaged in other predatory and fraudulent conduct that allowed them to fraudulently extract even more monies from FTE.  Among other things, Defendants charged FTE hundreds of thousands of dollars in so-called "Underwriting & ACH Fees" to cover the costs of due diligence that they never performed and ACH operations they were fully automated and cost a mere fraction of the fees charged to FTE.

3.     While these accusations may be alarming, it is not the first time Defendants have been accused of such predatory tactics.  On September 10, 2021, the United States Bankruptcy Court for the District of Montana, held that the form of agreement utilized by Marmott and Cap Call are loans as a matter of law and thus subject to state usury laws.  *See Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 70 Bankr. Ct. Dec. 187, 2021 WL 4144933 (Bankr. D. Mont. Sept. 10, 2010).  Cap Call and Marmott are now collaterally estopped from contesting that their form agreements are anything but loans subject to state usury laws.

4.     It is against this backdrop that Lateral files this Complaint.

**THE PARTIES**

5.     FTE Networks was a corporation duly organized under the laws of Nevada with its principal place of business located in Naples, Florida.  At all times material hereto, it was the sole owner of Benchmark and the sole owner and managing member of Jus-Com and Focus Wireless.

6.      At all times material hereto, Benchmark was a corporation duly organized under the laws of New York with its principal place of business located in New York, New York.

7.      At all times material hereto, Jus-Com was a limited liability company duly organized under the laws of Indiana with its principal place of business in Naples, Florida.

8.      At all times material hereto, Focus was a limited liability company duly organized under the laws of Florida with its principal place of business in Naples, Florida.

9.      At all times material hereto, Lateral was a limited liability company duly organized under the laws of Delaware with its principal place of business in California.

10.     Upon information and belief, Cap Call is a limited liability company organized under the laws of New York with a principal place of business located at 122 East 42nd St., Suite 2112, New York, New York, 10168.

11.     Upon information and belief, Yes Funding is a limited liability company organized under the laws of New York with a principal place of business located at 122 East 42nd St., Suite 2112, New York, New York, 10168.

12.     Defendant Evan Marmott is the principal owner of Cap Call and an adult resident and citizen of New York residing at 2644 211th St. Bayside, New York, 11360-2521.

## JURISDICTION

13.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims, individually, and on behalf of similarly situated persons, for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.  The Court has subject-matter jurisdiction over the state-law claims of the Plaintiffs' and putative Class Members because they are so related to the federal claims asserted herein that they form part of the same case or controversy under Article III of the United States Constitution.

14.     Additionally, this Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred here.

16.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

## COMMON FACTUAL ALLEGATIONS

### A.     The Predatory Merchant Cash Advance CA Industry

17.     Cap Call and Yes Funding are part of MCA industry and they are also part of a RICO enterprise ("Enterprise") controlled and operated by Marmott.

18.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."[3]

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.
[2] *Id.*
[3] *Id.*

19.     The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.  National Consumer Law Center, *supra*.

20.     This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id*. ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

21.     The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**B.     The MCA Agreements Are Substantively And Procedurally Unconscionable.**

22.     The Enterprise agreements (the "MCA Agreements"), including those entered into by the Plaintiffs, are unconscionable contracts of adhesion that are not negotiated at arms-length.

23.     Instead, they contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that the transactions (collectively, the "Transactions"), including those involving the Plaintiffs, are really loans.

24.     Among these one-sided terms, the MCA Agreements include:  (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any

assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance, (12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney "to take any and all action necessary to direct such new or additional credit card processor to make payment to [the Enterprise]," and (15) a power of attorney authorizing the MCA company "to take any action or execute any instrument or document to settle all obligations due…."

25.     The MCA Agreements are also unconscionable because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by (1) forcing the merchant to wait until the fifteenth of each month before entitling it to invoke the reconciliation provision, (2) preventing the merchant from obtaining other financing, (3) and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of merchant.

26.     The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.  Among these improper penalties, the MCA Agreements (1) require the merchant to sign a confession of judgment entitling the MCA company to liquidated attorneys' fees based on a percentage of the amount owed rather than a good-faith estimate of the

attorneys' fees required to file a confession of judgment, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just four fixed daily payments.

**C.     The Enterprise Uses a Sham Reconciliation Provision to Disguise the Loans.**

27.     In order to evade state usury laws, the Enterprise includes a sham reconciliation provision in the MCA Agreements to give the appearance that the loans do not have a definite term.

28.     Under a legitimate reconciliation provision, if a merchant pays more through its fixed daily payments than it actually received in receivables, the merchant is entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

29.     For example, if an MCA company purchased 25% of the merchant's receivables, and the merchant generated $100,000 in receivables for the month, the most that the MCA company is entitled to keep is $25,000.  Thus, if the merchant paid $40,000 through its daily payments, then the merchant is entitled to $15,000 back under the sham reconciliation provision.

30.     In order to ensure that a merchant can never use their sham reconciliation provision, however, the Enterprise falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased.  By doing so, the Enterprise ensures that if sales decrease, the required fixed daily payments remain the same.

31.     For example, if 25% of a merchant's actual monthly receivables would result in a daily payment of $1,000, the enterprise falsely states that the good-faith estimate is only $500 per day so that if sales did in fact decrease by 50%, the merchant would not be able to invoke the reconciliation provision.

32.     On information and belief, the Enterprise does not have a reconciliation department, does not perform reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.

33.     In fact, the Enterprise MCA Agreements specifically require the Enterprise MCA companies to affirmatively reconcile the accounts each month but never do.

**D.     The Enterprise Intentionally Disguised the True Nature of the Transactions.**

34.     Despite their documented form, the Transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

> (a)     The daily payments required by the MCA Agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the purchased amount was to be repaid within a specified time;
>
> (b)     The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the purchased amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in a designated account to make the daily payments and, after a certain number of instances of insufficient funds being maintained in the account, the merchants were in default and, upon default, the outstanding balance of the purchased amount became immediately due and owing;
>
> (c)     While the MCA Agreements purported to "assign" all of the merchant's future account receivables to the Enterprise until the purchased amount was paid, the merchants retained all the *indicia* and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the purchased amount;
>
> (d)     Unlike true receivable purchase transactions, the Enterprise Transactions were underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;
>
> (e)     The purchased amount was not calculated based upon the fair market value of the merchant's future receivables, but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

8

(f)     The amount of the daily payments was determined based upon when the Enterprise wanted to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements;

(h)     The Enterprise required that the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)     The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

## UNDERLYING FACTS

A.     **FTE Networks.**

35.     At all times material hereto, FTE Networks, together with its wholly owned subsidiaries provided innovative, technology-oriented solutions for smart platforms, network infrastructures and buildings.   The company provided end-to-end design, construction management, build and support solutions for state-of the art networks, data centers, residential, and commercial properties and services for Fortune 100/500 companies.   The company's operations were generally divided into three sections: (i) construction, (ii) telecommunication design and solutions and (iii) wireless equipment installation.   Each business section was managed by one of FTE's subsidiaries, Benchmark, Jus-Com or FTE Wireless.

36.     Benchmark was a New York based construction manager and general contractor serving a diverse client base in the telecommunications, retail, professional services, industrial, technology and financial services industries.

37.     Jus-Com provided telecommunications solutions in the wireline and wireless telecommunications industry including the design, engineering and repairing of fiber optic, copper and coaxial cable networks.

38.     Focus Wireless provided wireless solutions to major wireless carriers including equipment installation, fiber backhaul, antennae installation and testing, fiber-to-site and other turnkey solutions as needed by such clients.

**B.     Lateral**

39.     On or about October 28, 2016, Lateral Juscom Feeder LLC ("Lateral Juscom"), as administrative agent for the lenders, entered into a Credit Agreement (as thereafter amended, supplement and/or supplemented and together with all documents executed in connection therewith, the "Credit Agreement") with Jus-Com, FTE Networks and Benchmark as borrowers and Focus Wireless and other FTE Networks subsidiaries as guarantors (previously collectively defined as "FTE"), pursuant to which the lenders agreed to extend loans and other financial accommodations up to a maximum amount, as amended from time-to-time, which was approximately $50 million as of July 2019.

40.     FTE's obligations were secured by the grant of a security interest in substantially all of FTE's assets.

41.     Lateral Juscom properly perfected its interests in the collateral by timely making the appropriate UCC filings in the appropriate jurisdictions.

42.     In or around July 2019, FTE defaulted under the terms of the Credit Agreement. Thereafter, Lateral Juscom declared a default and pursuant to a Surrender of Collateral and Strict Foreclosure dated as of October 10, 2019 (the "Foreclosure Agreement"), FTE agreed to

surrender and turnover its interest in the collateral including, without limitation, the claims asserted herein which, pursuant to the Foreclosure Agreement, were assigned to Lateral.

**C.      FTE Networks and the MCA Industry**

43.      In 2017, prior to defaulting under the Credit Agreement, FTE needed additional financing.   To procure that financing, FTE turned to the merchant cash advance industry, including Cap Call and Yes Funding.

44.      Like many MCA companies Cap Call and Yes Funding prey upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders. Although their agreements are titled "Merchant Agreements" and purport to represent the sale/purchase of a businesses' future revenue, Cap Call and Yes Funding market, underwrite and collect upon their transactions as loans, with interest rates far above those permissible under New York law.

45.      The Enterprise also shows in its underwriting practices that their agreements are loans.   Typically, banks and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.   When underwriting new transactions, the Enterprise does not evaluate the merchants' receivables, which are the assets they are purportedly buying, but instead focus on other factors such as a merchant's credit ratings and bank balances, if they perform any due diligence at all.

46.      When the Enterprise collects upon their agreements, it treats them just like loans. For example, it requires that the merchant make fixed daily payments under their agreements and grant security interests to the Enterprise in substantially all of the merchant's assets to ensure that the daily payments are made.

47.     They also require that the merchants execute confessions of judgment that the Enterprise could file if the merchant fails to make as few as two daily payments under their agreements.   In other words, the Enterprise structures its transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

48.     FTE fell victim to all of these predatory tactics.

**D.      The Enterprise Loans to FTE.**

**1.      The Cap Call Transactions**

49.      In November 2018, FTE entered into four transactions with Cap Call pursuant to which Cap Call advanced FTE just $628,387.50 actual cash, but collected an astounding $2,491,163.50 in less than fourt months.

50.     Under the first agreement dated November 16, 2018 (the "November 16 Cap Call Agreement"), Cap Call agreed to advance $400,000 (the "Purchase Price") to FTE in exchange for the purported purchase of "all" of FTE's future receipts (the "Future Receipts") until such time as the amount of $599,600 (the "Purchased Amount") was repaid.

51.     The Purchased amount was to be repaid through the daily ACH withdrawals in the amount of $29,999 (a "Daily Payment") such that the Purchased Amount would be repaid in just 4 weeks which, on its face, translates into an annual interest rate of more than 645% per annum or more than 25 times the maximum 25% per annum permitted under New York Penal Law.

52.     Even worse, Cap Call did not advance FTE the full Purchase Price.  Instead, Cap Call advanced only $117,761.00 with the remaining Purchase Price going to pay "Underwriting & ACH Program" and other fees.

53.     While the Underwriting & ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Cap Call performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Underwriting & ACH Program and other fees were merely additional disguised interest under the November 16 Cap Call Agreement.

54.     When this disguised interest is taken into consideration, the actual interest rated under the November 16 Cap Call Agreement exceeded 900% per annum.

55.     FTE made the Daily Payments under November 16 Cap Call Agreement through December 4, 2018.

56.     On or about November 23, 2018, Cap Call and FTE entered into another agreement (the "November 23 Agreement") pursuant to which Cap Call agreed to advance $275,000 (the "Purchase Price") to FTE in exchange for the purported purchase of "all" of FTE's future receipts (the "Future Receipts") until such time as the amount of $412,225 (the "Purchased Amount") was repaid.

57.     The Purchased amount was to be repaid through the daily ACH withdrawals in the amount of $14,999 (a "Daily Payment") such that the Purchased Amount would be repaid in just 6 weeks which, on its face, translates into an annual interest rate of more than 430% per annum or more than 20 times the maximum 25% per annum permitted under New York Penal Law.

58.     Even worse, Cap Call did not advance FTE the full Purchase Price.  Instead, Cap Call advanced only $70,235 with the remaining Purchase Price used to: (i) pay off the balance of an agreement with Yes Funding ($179,765) and (ii) pay Underwriting & ACH Program and other fees ($25,000).

59.     While the Underwriting & ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Cap Call performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Underwriting & ACH Program and other fees were merely additional disguised interest under the November 23 Cap Call Agreement.

60.     When this disguised interest is taken into consideration, the actual interest rated under the November 23 Cap Call Agreement exceeded 560% per annum.

61.     FTE made the Daily Payments under November 23 Cap Call Agreement.

62.     On or about November 30, 2018, Cap Call sent FTE another agreement (the "November 30 Cap Call Agreement" and, together with the November 16 Cap Call Agreement, the "Cap Call FTE Agreements") which Cap Call ultimately fund under December 3, 2018.

63.     Under the November 30 Cap Call Agreement, Cap Call agreed to advance $800,000 (the "Purchase Price") to FTE in exchange for the purported purchase of "all" of FTE's future receipts (the "Future Receipts") until such time as the amount of $1,359,200 (the "Purchased Amount") was repaid.

64.     The Purchased amount was to be repaid through the daily ACH withdrawals in the amount of $45,306 (a "Daily Payment") such that the Purchased Amount would be repaid in just 6 weeks which, on its face, translates into an annual interest rate of more than 600% per annum or more than 25 times the maximum 25% per annum permitted under New York Penal Law.

65.     Even worse, Cap Call did not advance FTE the full Purchase Price.  Instead, Cap Call advanced only $240,391.50 with the remaining Purchase Price used to: (i) pay off the

balance of November 16 Cap Call Agreement ($254,611.50) and (ii) pay Underwriting & ACH Program and other fees ($304,997.00).

66.     While the Underwriting & ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Cap Call performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Underwriting & ACH Program and other fees were merely additional disguised interest under the November 30 Cap Call Agreement.

67.     When this disguised interest is taken into consideration, the actual interest rated under the November 30 Cap Call Agreement exceeded 1,500% per annum.

68.     FTE made the Daily Payments under November 30 Cap Call Agreement.

69.     On or about December 14, 2018, Cap Call sent FTE another agreement (the "December 14 Cap Call Agreement") which Cap Call ultimately fund under December 20, 2018.

70.     Under the December 14 Cap Call Agreement, Cap Call agreed to advance $250,000 (the "Purchase Price") to FTE in exchange for the purported purchase of "all" of FTE's future receipts (the "Future Receipts") until such time as the amount of $374,750 (the "Purchased Amount") was repaid.

71.     The Purchased amount was to be repaid through the daily ACH withdrawals in the amount of $12,492 (a "Daily Payment") such that the Purchased Amount would be repaid in just 6 weeks which, on its face, translates into an annual interest rate of more than 430% per annum or more than 20 times the maximum 25% per annum permitted under New York Penal Law.

72.     Even worse, Cap Call did not advance FTE the full Purchase Price.  Instead, Cap Call advanced only $200,00 after deducting $50,000 in Underwriting & ACH Program Fees

73.     While the Underwriting & ACH Program Fees purportedly related to the costs of due diligence and withdrawing the Daily Payments, Cap Call performed little or no due diligence and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Underwriting & ACH Program and other fees were merely additional disguised interest under the December 14 Cap Call Agreement.

74.     When this disguised interest is taken into consideration, the actual interest rated under the November 30 Cap Call Agreement exceeded 750% per annum.

75.     FTE made the Daily Payments under December 14 Cap Call Agreement.

**2.     The Yes Funding Transaction**

76.     By an agreement dated September 13, 2018 (the "September 13 Yes Agreement"), Yes Funding agreed to advance $250,000 (the "Purchase Price") to FTE in exchange for the purported purchase of "all" of FTE's future receipts (the "Future Receipts") until such time as the amount of $374,750 (the "Purchased Amount") was repaid.

77.     The Purchased amount was to be repaid through the daily ACH withdrawals in the amount of $12,999 (a "Daily Payment") such that the Purchased Amount would be repaid in just 6 weeks which, on its face, translates into an annual interest rate of more than 430% per annum or more than 25 times the maximum 25% per annum permitted under New York Penal Law.

78.     Even worse, Cap Call did not advance FTE the full Purchase Price.  Instead, Cap Call advanced only $200,000 with the remaining Purchase Price going to pay "Underwriting & ACH Program" and other fees.

79.     While the Underwriting & ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Cap Call performed little or no due diligence

and the actual costs of the ACH withdrawals were a fraction of the fee.  Indeed, in reality, the Underwriting & ACH Program and other fees were merely additional disguised interest under the September 13 Yes Agreement.

80.   When this disguised interest is taken into consideration, the actual interest rated under the September 13 Yes Agreement exceeded 750% per annum.

81.   Although dated September 13, the agreement was not funded until October 9, 2018.

82.   FTE made the Daily Payments under September 13 Yes Agreement through October 25, 2018 when the then outstanding balance was paid off with the proceeds of the November 23 Cap Call Agreement.

**E.   The Yes and Cap Call Agreements were not sales of future receipts.**

83.   The terms and conditions of the Yes and Cap Call Agreements were identical.

84.   Notwithstanding their titles, the Yes and Cap Call Agreements were not the sale/purchase of receivables.  Plain and simple, there were loans.

85.   The Yes Funding and Cap Call Agreements had none of indicia of a true sale and all the indicia of a loan.  Among other things: (i) the Future Receipts allegedly purchased by Yes Funding and Cap Call had already been sold and Yes Funding and Cap Call knew it; (ii) the terms of the Yes Funding and Cap Call Agreements failed to transfer the risk and benefits of ownership of the Future Receipts from FTE to Cap Call or Yes Funding; (iii) FTE remained absolutely liable for repayment of the Purchased Amounts; (iv) Cap Call and Yes Funding full recourse rights against FTE and their then Chief Executive Officer, Michael Palleschi and their then Chief Financial Officer, David Lethem; (v) the Daily Payments were fixed and required

payment within the specific time period chosen Cap Call and Yes Funding; and (vi) the agreements' reconciliation provisions were a sham.

> **1.      The Future Receipts had already been sold when Yes and Cap Call allegedly purchased them and Yes Funding and Cap Call knew it.**

86.      The Yes Funding and Cap Call transactions could not possibly have been a sale and purchase of FTE's Future Receipts because FTE had already sold its Future Receipts to other MCA companies and there was nothing to purchase.

87.      When they entered into their transactions with FTE, Yes Funding and Cap Call knew that FTE had already sold its Future Receipts and there was nothing to purchase because the broker, Direct Cash Group, had also brokered deals with other MCA companies, and acted as Yes Funding's and Cap Call's agent with the authority to bind the companies to the agreements.

88.      Additionally, the Yes Funding and Cap Call transactions overlapped such that FTE had already sold all of its Future Receipts to Yes Funding when it entered into its first deal with Cap Call and, thereafter, allegedly sold its Future Receipts to Cap Call under two different agreements that were in effect at the same time.

89.      The attempt to purchase receipts that had already been sold is a sham designed and intended to conceal the fact that the Yes Funding and Cap Call transactions were actually loans.

> **2.      The terms of the Yes Funding and Cap Call Agreements failed to transfer the risk and benefits of ownership of the Future Receipts from FTE to Yes Funding or Cap Call.**

90.      The sine *qua non* of any sale is that absolute title and ownership of the allegedly purchased good transfer from the seller to the buyer.  That did not occur in the instant case.

91.     Here, FTE was responsible for generating and collecting the Future Receipts, it exercised complete dominion and control over the Future Receipts and it retained the risk of non-collectability with respect to the Future Receipts.  In other words, notwithstanding the sale and assignment language of the Yes Funding and Cap Call Agreements, all of the benefits and risks of ownership of the Future Receipts remained with FTE.

92.     Pursuant to the Yes Funding and Cap Call Agreements, FTE was responsible for collecting the proceeds of its transactions and depositing a "Specified Percentage" of each transaction into a designated account so that Yes Funding and Cap Call could debit the Daily Payments.

93.      So long as it made the Daily Payments, FTE was free to use the remaining proceeds of any transaction, including the proceeds of a supposedly purchased Future Receipt, in its daily operations.

94.     Indeed, the excess proceeds were supposedly FTE's only source of financing because the Yes Funding and Cap Call Agreements specifically prohibited FTE from further encumbering the Future Receipts.  Thus, FTE had to use the proceeds of the allegedly purchased Future Receipts in order to operate its business.

95.     FTE's complete dominion and control over the Future Receipts and its right to use the proceeds of the alleged purchased Future Receipts are entirely inconsistent with a sale because such control and rights are the benefits of ownership that would pass to the seller if the Yes Funding and Cap Call Agreements were a true sale.

96.     Similarly, FTE retained the risk of loss associated with non-payment of the Future Receipts.  Among other things, if a particular Future Receipt was not collectible, there was no

reduction in the Purchased Amount and Yes Funding and Cap Call would be repaid from the next collected Future Receipt or the proceeds of any other sale transaction.

      **3.**      **FTE remained absolutely liable for repayment of the Purchased Amount.**

97.     By operation of the default rights and remedies under the Yes and Cap Call Agreements, repayment of the Purchased Amount was put beyond any risk of non-payment and FTE remained absolutely liable for repayment of the Purchased Amounts.

98.     Under the Yes Funding and Cap Call Agreements, if an Event of Default occurred, FTE immediately became liable for the full outstanding Purchased Amounts, together with additional fees and costs due under the Yes Funding and Cap Call Agreements.

99.     An Event of Default is defined under the Yes Funding and Cap Call Agreements so that a default would occur under any and every conceivable circumstance wherein FTE failed to generate or collect Future Receipts to repay Yes Funding and Cap Call Agreements .

100.     Most importantly, the failure of FTE to generate and collect sufficient revenue to make the Daily Payments would automatically constitute an Event of Default under the Yes Funding and Cap Call Agreements after just four days of having insufficient funds ("NSF") in the Account:

> NSF Fee - $35.00 (STANDARD) – UP TO FOUR TIMES ONLY
> BEFORE A DEFAULT IS DECLARED.

101.     FTE also defaulted under the Yes Funding and Cap Call Agreements if it: (i) violated any term of the agreements; (ii) transferred or otherwise sold its assets; or (iii) moved, terminated, interrupted or suspended its business in any way.  Accordingly, even if FTE's business was destroyed or suspended by a hurricane, flood, fire, a pandemic or other Act of God, it would be in default of the Yes Funding and Cap Call Agreements and, pursuant to the remedies provided by the Yes Funding and Cap Call Agreements, FTE would be liable for the

full outstanding balance of Purchased Amount, plus all fees and costs due under the Yes Funding and Cap Call Agreements.

**4.      Yes Funding and Cap Call retained full recourse rights against FTE.**

102.     In order to further ensure its performance under the Yes Funding and Cap Call Agreements, FTE granted Yes Funding and Cap Call a security interest in substantially all of its assets (the "Collateral").

103.     Upon an Event of Default, Yes Funding and Cap Call were entitled to exercise all of their rights and remedies under the UCC.

104.     Thus, if FTE missed as few as four Payments, for any reason whatsoever, Yes Funding and Cap Call could foreclose on the Collateral.

105.     Additionally, FTE was required to and did execute confessions of judgment that could be entered if it defaulted under the Yes Funding and Cap Call Agreements.

106.     Such recourse provisions are not indicative of a true sale, but rather, a loan.

**5.      The Daily Payments were fixed and resulted in a usurious interest rate.**

107.     On the face of the Yes Funding and Cap Call Agreements, FTE was required to repay the Purchased Amount through daily ACH debits from a designate account as follows:

| COMPANY | AGREEMENT DATE | PURCHASE PRICE | PURCHASED AMOUNT | DAILY | NO. | INTEREST RATE |
|---------|----------------|----------------|------------------|-------|-----|---------------|
| Yes Funding | 9/13/2018 | $250,000 | $374,750 | $12,999 | 29 | 430% |
| Cap Call | 11/16/2018 | $400,000 | $599,600 | $29,999 | 20 | 645% |
| Cap Call | 11/23/2018 | $275,000 | $412,225 | $14,999 | 28 | 430% |

| Cap Call | 11/30/2018 | $800,000 | $1,359,200 | $45,306 | 30 | 600% |
| Cap Call | 12/14/2018 | $250,000 | $374,750 | $12,492 | 30 | 430% |

108. When the so-called "fees" and other forms of disguised interest are taken into account, the interest rates are even greater:

| COMPANY | AGREEMENT DATE | PURCHASE PRICE LESS FEES | PURCHASED AMOUNT | DAILY | NO. | INTEREST RATE |
|---|---|---|---|---|---|---|
| Yes Funding | 9/13/2018 | $200,000 | $374,750 | $12,999 | 29 | 750% |
| Cap Call | 11/16/2018 | $117,761 | $599,600 | $29,999 | 20 | 900% |
| Cap Call | 11/23/2018 | $250,000 | $412,225 | $14,999 | 28 | 560% |
| Cap Call | 11/30/2018 | $559,608 | $1,359,200 | $45,306 | 30 | 1,500% |
| Cap Call | 12/14/2018 | $200,000 | $374,750 | $12,492 | 30 | 750% |

109. There can be no question that the Daily Payments under the Yes Funding and Cap Call Agreements were fixed.

110. Under each of the Yes Funding and Cap Call Agreements, FTE was obligated to repay the Purchased Amount by remitting 15% (the "Specified Percentage") of its "daily receipts" into a specific designated account (the "Designated Account") and Cap Call and/or Yes Funding would debit the Daily Payment from the Designated Account.

111. The Daily Payments were supposed to equal 15% of FTE's daily receipts, but, in reality, the Daily Payments reflected nothing more than how quickly Yes Funding and Cap Call wanted to get paid.

112. The sham is revealed on the face of the Yes Funding and Cap Call Agreements themselves. Despite the fact that the Specified Percentage was always 15%, the actual amount of the Daily Payment fluctuated widely from $12,492 to $45,306.

22

113.    Moreover, pursuant to their respective agreements, Yes Funding and Cap Call were given viewing access to FTE's bank accounts "in order to calculate the amount of [FTE's] payments."   In other words, Yes Funding and Cap Call undertook to calculate, on daily basis, what 15% of  FTE's daily receipts would be and, on or about the fifteenth of every month, Yes Funding and Cap Call were supposed to reconcile their collections with FTE's actual receipts to ensure that they never collected more than 15% of FTE's receipts on a monthly basis.

114.    Despite being given viewing access to FTE's bank accounts for the express purpose of reconciling them, Yes Funding and Cap Call never performed any reconciliation of FTE's account nor did they ever intend to do so because the Daily Payments were not an actual estimate of 15% of FTE's daily receipts but rather, they were simply a reflection of how quickly Yes Funding and Cap Call wanted to be repaid.

**FIRST CAUSE OF ACTION**
**(RICO:  18 U.S.C. § 1962)**

115.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

116.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

117.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

118.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity

statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

119.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

120.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

121.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

122.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

123.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

124.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."


**B.    Culpable Persons.**

125.    Evan Marmott is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

126.    Marmott is the sole owner of Yes Funding and Cap Call which, collectively, have fewer than ten (10) employees.

**C.    The Enterprise**

127.    Yes Funding and Cap Call are separately incorporated and enjoy a legal independence separate and apart from one another, who, together with Marmott constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

128.    Yes Funding, Cap Call and Marmott are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York.

129.    Upon information and belief, since at least 2016 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through shared personnel, shared offices in New York, and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to businesses throughout the United States, including FTE.

130.    The debt, including such debt evidence by the Yes Funding and Cap Call Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate.  Here, the annualized rate charged to FTE under Yes Funding and Cap Call Agreements is not less than 400% and, in some cases, as high as 1,500%, rates that are at least four times (4x) greater the maximum twenty-five percent (25%) that is permitted to be charged under New York Penal Law §190.40.

C.    **Each Member's Role in the Enterprise**

131.     The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts.  Generally speaking, through a series of brokers, Yes Funding and Cap Call solicit the merchants, underwrite, fund, collect and enforce the usurious loans.   Marmott directs and controls the entire Enterprise.   More specifically:

### i.       The Enterprise MCA Companies.

132.     At all times material hereto, Yes Funding and Cap Call were responsible for: (i) determining the form of the agreements used by the Enterprise; (ii) underwriting the agreements; (iii) determining the Purchase Price, Purchased Amount and Daily Payments under the agreements; (iv) approving the Enterprises' entry into the agreements; (v) funding the usurious loans entered into by the Enterprise; (vi) servicing the usurious loans and (vii) collecting upon the unlawful debt.

133.     In this case, the Yes Funding and Cap Call: (i) entered into their respective agreements with FTE; (ii) funded the amounts advanced to FTE under the Yes Funding and Cap Call Agreements by wire transfers into the designated account; (iii) communicated with FTE concerning the loans through email; and (iv) collected the Daily Payments through the ACH withdrawals from FTE's designated account through a processor.

134.     Yes Funding and Cap Call ultimately benefit from the Enterprise's unlawful activity by receiving all or a portion of the proceeds from the unlawful debt.

135.     Upon information and belief, Yes Funding and Cap Call also engage in financing that does not involve the collection of an unlawful debt and is not part of the Enterprises' scheme.

ii.     **Marmott**

136.    Marmott is the founder and an owner of Yes Funding and Cap Call.  He is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, and the ultimate payment terms, amount and period of each usurious loan, including the FTE Agreements.

137.    In his capacity as a day-to-day leader of the Enterprise, Marmott is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the amount and repayment period of the usurious loans extend by the Enterprise to merchants; (iii) the fees charged to merchants under the Enterprise's agreements and (iv) the method of collecting the daily payments via ACH withdrawals.  All such forms were used to make and collect upon the unlawful loans including, without limitation, the loan extended to FTE under the Yes Funding and Cap Call Agreements.

138.    Marmott has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing members of the Enterprise to make loans to merchants, to fund only certain amounts of those loans and to collect upon the unlawful loans.

139.    In this case, Marmott: (i) approved the Enterprises' entry into the FTE Agreements and the payment terms thereunder; (ii) authorized the Enterprise to charge FTE certain fees under the Yes Funding and Cap Call Agreements; (iii) authorized the ACH

27

withdrawals used by the Enterprise to collect the Daily Payments under the Yes Funding and Cap Call Agreements; and (iv) approved the policies and procedures by which the Enterprises enforced the Yes Funding and Cap Call Agreements.

140.    Through salary, bonuses, profits, commissions, or other distributions by Yes Funding and Cap Call, Reich has ultimately benefited from the Enterprise's funneling of a portion or all of the usurious loan proceeds to the Enterprise.

**D.    Interstate Commerce**

141.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

142.    Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in Florida, including FTE, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

143.    In the present case, all communications between the members of the Enterprise and Plaintiff were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.    Specifically, the Enterprise used interstate emails to originate, underwrite, service and enforce the Yes Funding and Cap Call Agreements.    The FTE Agreements and confessions of judgments were executed by FTE in Florida and all communications between the Enterprise were emails and telephone calls between the Enterprise's offices in New York and FTE's offices in Florida.

144.    Additionally, all advances under the FTE Agreements were wired from banks located in New York to banks located in Florida and all Daily Payments were initiated by banks located in New York and the funds withdrawn from accounts opened and maintained in Florida.

### E.    Injury and Causation

145.    FTE has and will continue to be injured in its business and property by reason of Marmott's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.  The injuries to the Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, the millions of dollars paid to Yes Funding and Cap Call by FTE under the Yes Funding and Cap Call Agreements or otherwise collected by the Enterprise, at the direction of Marmott, on account of the usurious and otherwise unenforceable Yes Funding and Cap Call Agreements and attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting Marmott's unlawful activities.

146.    Pursuant to 18 U.S.C. § 1964(c), the Lateral, as the assignee of FTE, is entitled to treble damages, plus costs and attorneys' fees from Marmott

### SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

147.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

148.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

149.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and

29

collection of the unlawful loans, including the Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

150.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreements, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

151.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

152.    The participation and agreement of each of Defendant was necessary to allow the commission of this scheme.

153.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

154.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

155.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

156.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

### THIRD CAUSE OF ACTION
**(Fraud)**

157.    Plaintiff repeats and re-alleges the allegations set forth above.

158.    Each of the Yes Funding and Cap Call Agreements was executed through an instrument drafted and authorized by Defendants.

159.    Defendants were aware of the language used in the form of their respective agreements.

160.    In connection with each of the MCA loans, Defendants represented that they would charge a fee equal to 20% of the Purchase Price for "Underwriting & ACH" costs.

161.    In fact, Yes Funding and Cap Call incurred substantially lower underwriting and ACH costs because they performed little or no due diligence in entering into Yes Funding and Cap Call Agreements and the cost of administrating the daily ACH withdrawals was a fraction of what fees charged by Yes Funding and Cap Call under their agreements:

| COMPANY | AGREEMENT DATE | FEES |
|---|---|---|
| Yes Funding | 9/13/2018 | $50,000 |
| Cap Call | 11/16/2018 | $282,239 |

| COMPANY | AGREEMENT DATE | FEES |
|---------|----------------|------|
| Cap Call | 11/23/2018 | $25,000 |
| Cap Call | 11/30/2018 | $240,392 |
| Cap Call | 12/14/2018 | $50,000 |
| **Total** | | $647,631 |

162.    At the time that Yes Funding and Cap Call charged FTE these fees for "Underwriting & ACH" costs, they knew they had not and would incur these fees.

163.    Plaintiffs reasonably relied upon these knowingly false representations by agreeing to pay these fees.

164.    Plaintiffs have, in fact, paid substantial fees as a direct and proximate result of these knowingly false representations by Defendants.

## FOURTH CAUSE OF ACTION
### (Usury)

165.    Plaintiffs repeat and reallege each of the above allegations herein.

166.    With respect to each of the transactions above, Defendants knowingly charged FTE interest in excess of 25%.

167.    With respect to each of the transactions, FTE did in fact pay Defendants interest in excess of 25%.

168.    Under controlling New York law, Plaintiffs had no obligation to pay Defendants either principal or interest under each of the transactions above because the transactions violated New York Penal Law §190.40.

169.    In total, Plaintiffs have paid Defendants at least $2,685,163.50 in unlawful principal and interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek the entry of a judgment:

a)  Declaring each of Plaintiffs' agreements with Defendants to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)  Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at a hearing;

c)  Awarding treble damages;

d)  Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

Dated:  March 22, 2022

WHITE AND WILLIAMS LLP

By: _____

Shane R. Heskin
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs*

33